UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VASIF "VINCENT" BASANK; FREDDY
BARRERA CARRERRO; MANUEL BENITEZ
PINEDA; MIGUEL ANGEL HERNANDEZ
BALBUENA; LATOYA LEGALL; CARLOS
MARTINEZ; ESTANLIG MAZARIEGOS;
MANUEL MENENDEZ; ANTAR ANDRES
PENA; and ISIDRO PICAZO NICOLAS,

                                    *Petitioner*,

              -against-

THOMAS DECKER, in his official capacity as
Director of the New York Field Office of U.S.
Immigrations & Customs Enforcement; and
CHAD WOLF, in his official capacity as Acting
Secretary, U.S. Department of Homeland
Security,

                                    *Respondents*.

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: _3/26/2020___ |

20 Civ. 2518 (AT)

**MEMORANDUM
AND ORDER**

ANALISA TORRES, District Judge:

Petitioners, Vasif "Vincent" Basank, Freddy Barrera Carrerro, Manuel Benitez Pineda,

Miguel Angel Hernandez Balbuena; Latoya Legall, Carlos Martinez, Estanlig Mazariegos,

Manuel Menendez, Antar Andres Pena, and Isidro Picazo Nicolas, are currently detained by

Immigration and Customs Enforcement ("ICE") in county jails where cases of COVID-19 have

been identified.  Petition ¶ 1, ECF No. 9.

Last night after 11:00 p.m., Petitioners filed an amended petition for a writ of habeas

corpus under 28 U.S.C. § 2241, seeking their release from ICE custody because of the public

health crisis posed by COVID-19.  *See* Petition.  Petitioners also filed an application for a

temporary restraining order ("TRO") pursuant to Rule 65 of the Federal Rules of Civil Procedure,

seeking an order (1) releasing them on their own recognizance, subject to reasonable and

appropriate conditions, and (2) restraining Respondents, Thomas Decker, in his official capacity

as Director of the New York Field Office of ICE, and Chad Wolf, in his official capacity as Acting Secretary of the U.S. Department of Homeland Security, from arresting Petitioners for civil immigration detention purposes during the pendency of their immigration proceedings. TRO at 1, ECF No. 6.

For the reasons stated below, the TRO is GRANTED, and (1) Respondents, and the Hudson, Bergen, and Essex County Correctional Facilities, are ORDERED to **immediately** release Petitioners today on their own recognizance, and (2) Respondents are RESTRAINED from arresting Petitioners for civil immigration detention purposes during the pendency of their immigration proceedings.

## BACKGROUND

Petitioners were detained by ICE in connection with removal proceedings pending at the Varick Street Immigration Court. They are housed in New Jersey county jails where either detainees or staff have tested positive for COVID-19. TRO at 3–4. Specifically, Petitioners Basank, Benitez Pineda, and Mazariegos are detained at the Hudson County Correctional Facility ("Hudson County Jail"). Petition ¶¶ 5, 7, 11. Petitioners Barrera Carrerro, Hernandez Balbuena, Legall, Martinez, and Menendez are detained at the Bergen County Correctional Facility ("Bergen County Jail"). *Id.* ¶¶ 6, 8, 9, 10, 12. Petitioners Pena and Picazo Nicolas are detained at the Essex County Correctional Facility ("Essex County Jail"). *Id.* ¶¶ 13–14.[1]

Each Petitioner suffers from chronic medical conditions, and faces an imminent risk of death or serious injury in immigration detention if exposed to COVID-19. Basank is 54 years old and has a lengthy history of smoking. *Id.* ¶ 5. Barrera Carrerro, age 39, has underlying

---

[1] During oral argument, Respondents represented to the Court that five Petitioners—Hernandez Balbuena, Legall, Menendez, Basank, and Benitez Pineda—are expected to be released today. However, because Petitioners are not yet released, and because counsel for Petitioners indicated, and Respondents did not dispute, that ICE may take as long as a day to complete the release process, the Court enters the TRO as to all Petitioners directing their immediate release today without fail.

health conditions, including obesity, respiratory problems, a history of gastrointestinal problems, and colorectal bleeding.  *Id.* ¶ 6.  Benitez Pineda is 44, with pulmonary issues and a history of hospitalization for severe pneumonia.  *Id.* ¶ 7.  Hernandez Balbuena suffers from diabetes and diabetes-related complications.  *Id.* ¶ 8.  Legall is 33 years old, and suffers from respiratory problems, including asthma.  *Id.* ¶ 9.  Martinez, age 56, suffers from severe heart disease, and has a history of hospitalization for congestive heart failure, severe aortic valvular insufficiency, and acute systolic failure, requiring immediate heart valve replacement surgery.  *Id.* ¶ 10. Mazariegos is 44, and suffers from high blood pressure and pre-diabetes.  *Id.* ¶ 11.  Menendez is 31 years old and suffers from chronic asthma.  *Id.* ¶ 12.  At 36, Pena is asthmatic and has chronic obstructive pulmonary disease ("COPD"), which require inhalers and other medical treatment. *Id.* ¶ 13.  Picazo Nicolas, age 40, suffers from Type II diabetes and morbid obesity.  *Id.* ¶ 14.

On March 16, 2020, Hannah McCrea, an attorney with Brooklyn Defender Services, emailed Assistant United States Attorney Michael Byars, requesting that ICE release particularly vulnerable individuals, including Petitioners Basank, Legall, Martinez, and Picazo Nicolas. Harper Decl. ¶ 2, ECF No. 6-1.  On March 18, 2020, AUSA Byars responded that he did "not have a timeframe for ICE's response."  *Id.* ¶ 3.  On March 24, 2020, Alexandra Lampert, also a lawyer with Brooklyn Defender Services, emailed Byars to request the release of additional individuals identified as particularly vulnerable, including Petitioners Barrera Carrerro, Benitez Pineda, Hernandez Balbuena, Mazariegos, Menendez, and Pena.  *Id.* ¶ 4.  On March 25, 2020, Lampert again emailed Byars and informed him of Petitioners' intent to seek a temporary restraining order in the Southern District of New York, with the amended petition attached, thus putting Respondents on notice of Petitioners' serious medical conditions and their request for injunctive relief.  *Id.* ¶¶ 5, 7.

3

At 12:30 p.m. today, the Court held a telephonic hearing on Petitioners' request for a TRO.

## DISCUSSION

I.    Legal Standard

"A plaintiff seeking a temporary restraining order must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Natera, Inc. v. Bio-Reference Labs., Inc.*, No. 16 Civ. 9514, 2016 WL 7192106, at *2 (S.D.N.Y. Dec. 10, 2016) (internal quotation marks, citation, and alteration omitted).

"It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction." *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (collecting cases). "The showing of irreparable harm is perhaps the single most important prerequisite for a preliminary injunction." *CF 135 Flat LLC v. Triadou SPY N.A.*, No. 15 Civ. 5345, 2016 WL 2349111, at *1 (S.D.N.Y. May 3, 2016) (internal quotation marks, citation, and alteration omitted). Under this prong, the movant "must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." *NAACP v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995). To satisfy this requirement, a movant must demonstrate "that he would suffer irreparable harm if the TRO does not issue." *Andino*, 555 F. Supp. 2d at 419. "The district court has wide discretion in determining whether to grant a preliminary injunction." *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (internal quotation marks and citation omitted) (per curiam).

II.   Analysis

A.  Irreparable Harm

In the Second Circuit, a "showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotations and citations omitted).  That harm must be "actual and imminent" rather than speculative.  *Id.*

Petitioners have met their showing of irreparable harm, in establishing the risk of harm to their health and constitutional rights.

1.  Risk of Death

On March 11, 2020, the World Health Organization ("WHO") declared COVID-19 a global pandemic.  Petition ¶ 26.  At that time, there were more than 118,000 cases in 114 countries, and 4,291 people had died.  *Id.* ¶ 27.  Merely two weeks later, there have been at least 458,927 cases identified in 172 countries and at least 20,807 people have died.  *Id.*  New York and its surrounding areas have become one of the global epicenters of the outbreak.  *Id.* ¶ 35.  Petitioners are held at detention facilities located in northern New Jersey.  *See id.* ¶¶ 5–14.

As of March 26, 2020, New Jersey has 4,407 confirmed cases of COVID-19—the second highest number of reported cases by any state after New York.  Niko Kommenda and Pablo Gutierrez, *Coronavirus map of the US: latest cases state by state*, THE GUARDIAN (Mar. 26, 2020), https://www.theguardian.com/world/ng-interactive/2020/mar/26/coronavirus-map-of-the-us-latest-cases-state-by-state.  New Jersey also has the fourth most COVID-19 related deaths in the country.  *Id.*  The three counties where the jails are located—Bergen, Essex, and Hudson counties—comprise one third of the confirmed cases of COVID-19 in New Jersey, with Bergen County reporting 819 positive results, Essex reporting 381 positives, and Hudson 260.  Petition

¶ 36.  The jails are no exceptions.  Each of the jails where a Petitioner is being housed has reported confirmed cases of COVID-19.  *Id.* ¶ 41.  This includes two detainees and one correctional officer in the Hudson County Jail; one detainee at the Bergen County Jail; and a "superior officer" at the Essex County Jail.  *Id.*

The nature of detention facilities makes exposure and spread of the virus particularly harmful.  Jaimie Meyer M.D., M.S., who has worked extensively on infectious diseases treatment and prevention in the context of jails and prisons, recently submitted a declaration in this district noting that the risk of COVID-19 to people held in New York-area detention centers, including the Hudson, Bergen County, and Essex County jails, "is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected."  Meyer Decl. ¶ 7, *Velesaca v. Wolf*, 20 Civ. 1803 (S.D.N.Y. Feb. 28, 2020), ECF No. 42.

Moreover, medical doctors, including two medical experts for the Department of Homeland Security, have warned of a "tinderbox scenario" as COVID-19 spreads to immigration detention centers and the resulting "imminent risk to the health and safety of immigrant detainees" and the public.  Catherine E. Shoichet, *Doctors Warn of "Tinderbox scenario" if Coronavirus Spreads in ICE Detention*, CNN (Mar. 20, 2020), https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html.  "It will be nearly impossible to prevent widespread infections inside the Hudson, Bergen, and Essex County jails now that the virus is in the facilities because detainees live, sleep, and use the bathroom in close proximity with others, and because '[b]ehind bars, some of the most basic disease prevention measures are against the rules or simply impossible.'"  Petition ¶ 47 (internal quotation marks and citation omitted).

Petitioners face serious risks to their health in their confinement.  Each has underlying illnesses, including asthma, diabetes, heart disease, hypertension, obesity and respiratory problems including COPD.  *Id.* ¶¶ 5–14.  The Court takes judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality.  *People at Risk for Serious Illness from COVID-19*, CENTERS FOR DISEASE CONTROL (Mar. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html ("Older people and people of all ages with severe underlying health conditions—like heart disease, lung disease and diabetes, for example—seem to be at higher risk of developing serious COVID-19 illness."); *Information for Healthcare Professionals: COVID-19 and Underlying Conditions*, CENTERS FOR DISEASE CONTROL, (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html (listing, among other medical diagnoses, "moderate to severe asthma," "heart disease," "obesity," and "diabetes" as conditions that trigger higher risk of severe illness from COVID-19); *see* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."); *Brickey v. Superintendent, Franklin Corr. Facility*, No. 10 Civ. 085, 2011 WL 868148, at *2 n.3 (N.D.N.Y. Feb. 17, 2011) (taking judicial notice of the meaning and symptoms of the condition sciatica), *report and recommendation adopted*, 2011 WL 868087 (N.D.N.Y. Mar. 10, 2011); *Lin v. Metro. Life Ins. Co.*, No. 07 Civ. 03218, 2010 WL 668817, at *1 (S.D.N.Y. Feb. 25, 2010) ("In its decision, the Court took judicial notice of certain medical background information about Hepatitis B.").

A number of courts in this district and elsewhere have recognized the threat that COVID-19 poses to individuals held in jails and other detention facilities. *See United States v. Stephens*, No. 15 Cr. 95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("[I]nmates may be at a heightened risk of contracting COVID-19 should an outbreak develop.") (collecting authorities); *United States v. Garlock*, 18 Cr. 418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) ("By now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided. Several recent court rulings have explained the health risks—to inmates, guards, and the community at large—created by large prison populations. The chaos has already begun inside federal prisons—inmates and prison employees are starting to test positive for the virus, quarantines are being instituted, visits from outsiders have been suspended, and inmate movement is being restricted even more than usual." (citations omitted)); *see also* Letter from Mike McGrath, Chief Justice, Montana Supreme Court, to Montana Courts of Limited Jurisdiction Judges (Mar. 20, 2020), https://courts.mt.gov/Portals/189/virus/Ltr%20to%20COLJ%20Judges%20re%20COVID-19%20032020.pdf?ver=2020-03-20-115517-333 ("Because of the high risk of transmittal of COVID-19, not only to prisoners within correctional facilities but staff and defense attorneys as well, we ask that you review your jail rosters and release, without bond, as many prisoners as you are able, especially those being held for nonviolent offenses. . . . Due to the confines of [correctional] facilities, it will be virtually impossible to contain the spread of the virus."). Indeed, at least one court has ordered the release on bail of a non-citizen in immigration detention on the ground that detention conditions have been rendered unsafe by COVID-19. *Calderon Jimenez v. Wolf*, No. 18 Civ. 10225 (D. Mass. Mar. 26, 2020), ECF No. 507. Addressing the situation in New Jersey specifically, the New Jersey Supreme Court has held that "reduction of county jail populations,

under appropriate conditions, is in the public interest to mitigate risks imposed by COVID-19" in light of "the profound risk posed to people in correctional facilities arising from the spread of COVID-19," and has ordered the release of many individuals serving sentences in New Jersey county jails. *In the Matter of the Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N.J. Mar. 22, 2020).

Courts have also recognized that health risk to be particularly acute—and of constitutional significance—for inmates who are elderly or have underlying illnesses. *See United States v. Martin*, No. 19 Cr. 140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) ("[T]he Due Process Clauses of the Fifth or Fourteenth Amendments, for federal and state pretrial detainees, respectively, may well be implicated if defendants awaiting trial can demonstrate that they are being subjected to conditions of confinement that would subject them to exposure to serious (potentially fatal, if the detainee is elderly and with underlying medical complications) illness."). At least one court has ordered the release on bail of an inmate facing extradition on the basis of the risk to his health the pandemic poses. *Matter of Extradition of Toledo Manrique*, No. 19 MJ 71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) ("These are extraordinary times. The novel coronavirus that began in Wuhan, China, is now a pandemic. The nine counties in the San Francisco Bay Area have imposed shelter-in-place orders in an effort to slow the spread of the contagion. This Court has temporarily halted jury trials, even in criminal cases, and barred the public from courthouses. Against this background, Alejandro Toledo has moved for release, arguing that at 74 years old he is at risk of serious illness or death if he remains in custody. The Court is persuaded. The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail.").

The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO.  *See Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (upholding finding of irreparable harm "premised . . . upon [the district court's] finding that [plaintiff] was subject to risk of injury, infection, and humiliation"); *Mayer v. Wing*, 922 F. Supp. 902, 909 (S.D.N.Y. 1996) ("[T]he deprivation of life-sustaining medical services . . . certainly constitutes irreparable harm.").

### 2.  Constitutional Violations

Second, Petitioners have also shown irreparable harm because, as discussed below, they face a violation of their constitutional rights.  In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm.  *See, e.g.*, *Connecticut Dept. of Environmental Protection v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks and citations omitted)); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary) (emphasis in original); *Sajous v. Decker*, No. 18 Civ. 2447, 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2018) (finding that immigration detainee established irreparable harm by alleging that prolonged immigration detention violated his constitutional due process rights).

The Court finds, therefore, that Petitioners have established the threat of irreparable harm absent the TRO.

B.  Likelihood of Success on the Merits

The Court concludes that Petitioners have met their burden of showing a likelihood of success on the merits.  Petitioners argue that their continued confinement in ICE detention centers where COVID-19 is present and without adequate protection for their health violates their due process rights.  TRO at 8.  The Court agrees.

The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law.  The protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  An application for habeas corpus under 28 U.S.C. § 2241 is the appropriate vehicle for an inmate in federal custody to challenge conditions or actions that pose a threat to his medical wellbeing.  *See Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979) (allowing a § 2241 application to challenge an inmate's "transfer while seriously ill" where that transfer posed a risk of fatal heart failure).

Immigration detainees can establish a due process violation for unconstitutional conditions of confinement by showing that a government official "knew, or should have known" of a condition that "posed an excessive risk to health," and failed to take appropriate action. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) ("Deliberate indifference . . . can be established by either a subjective or objective standard: A plaintiff can prove deliberate indifference by showing that the defendant official recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to the plaintiff's health or safety." (internal quotation marks,

citation, and alterations omitted)).  The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious.[2]  It can no longer be denied that Petitioners, who suffer from underlying illnesses, are caught in the midst of a rapidly-unfolding public health crisis.  The Supreme Court has recognized that government authorities may be deemed "deliberately indifferent to an inmate's current health problems" where authorities "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," including "exposure of inmates to a serious, communicable disease," even when "the complaining inmate shows no serious current symptoms."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Petitioners need not demonstrate that "they actually suffered from serious injuries" to show a due process violation.  *Darnell*, 849 F.3d at 31; *see Helling*, 509 U.S. at 33.  Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to their future health" is sufficient.  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35) (alteration omitted).

Respondents have exhibited, and continue to exhibit, deliberate indifference to Petitioners' medical needs.  The spread of COVID-19 is measured in a matter of a single day—not weeks, months, or years—and Respondents appear to ignore this condition of confinement that will likely cause imminent, life-threatening illness.  At oral argument, Respondents represented that ICE and the detention facilities in which Petitioners are housed are taking certain measures to prevent the spread of virus:  screening detainees upon intake for risk factors, isolating detainees

---

[2]  Other courts have recognized of the heightened risk to detainees in contracting COVID-19.  *See, e.g.*, *Xochihua-Jaimes v. Barr*, 18-71460, Doc. No. 53 (9th Cir. Mar. 23, 2020) (unpublished) ("In light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers, the court *sua sponte* orders that Petitioner be immediately released from detention . . . ."); *Stephens*, 2020 WL 1295155, at *2 (ordering "conditions of 24-hour home incarceration and electronic location monitoring"); Chris Villani, *Releasing ICE Detainee, Judge Says Jail No Safer Than Court*, Law360, March 25, 2020 ("We are living in the midst of a coronavirus pandemic, some infected people die, not all, but some infected people die," U.S. District Judge Wolf said. "Being in a jail enhances risk. Social distancing is difficult or impossible, washing hands repeatedly may be difficult. There is a genuine risk this will spread throughout the jail.").

who report symptoms, conducting video court appearances with only one detainee in the room at a time, providing soap and hand sanitizer to inmates, and increasing the frequency and intensity of cleaning jail facilities.

These measures are patently insufficient to protect Petitioners.  At today's hearing, Respondents could not represent that the detention facilities were in a position to allow inmates to remain six feet apart from one another, as recommended by the CDC.  *See How to Protect Yourself*, CENTERS FOR DISEASE CONTROL (Mar. 18, 2020), https://www.cdc.gov/coronavirus/ 2019-ncov/prepare/prevention.html.  Nor could Respondents provide the Court with any information about steps taken to protect high-risk detainees like Petitioners.  And though Respondents represented that the detention facilities are below their full capacity, the appropriate capacity of a jail during a pandemic obviously differs enormously from its appropriate capacity under ordinary circumstances.  Confining vulnerable individuals such as Petitioners without enforcement of appropriate social distancing and without specific measures to protect their delicate health "pose[s] an unreasonable risk of serious damage to [their] future health," *Phelps*, 308 F.3d at 185 (internal quotation marks and citation omitted), and demonstrates deliberate indifference.

The Court holds, therefore, that Petitioners are likely to succeed on the merits of their due process claim that Respondents knew or should have known that Petitioners' conditions of confinement pose excessive risks to their health.[3]

C.  Balance of Equities and Public Interest

The equities and public interest weigh heavily in Petitioners' favor.  First, Petitioners face irreparable harm, to their constitutional rights and to their health.

---

[3]  The Court does not reach Petitioners' additional argument that they are likely to succeed on the merits of the claim that their due process rights were violated because their current conditions of confinement are punitive.  TRO at 8–9.

Second, the potential harm to Respondents is limited.  At today's hearing, Respondents were unable to identify a single specific reason for Petitioners' continued detention.  And the Court finds that there is none.  Petitioners' counsel committed to ensuring the continued appearance of Petitioners at immigration hearings.  And, of course, Petitioners' failure to appear at those hearings would carry grave consequences for their respective cases.  The Court finds that those incentives are sufficient to protect whatever interest Respondents may have in ensuring that Petitioners appear at future hearings and remain subject to the immigration laws.

At oral argument, Respondents raised the fact that Petitioners Martinez and Pena are currently mandatorily detained pursuant to 18 U.S.C. § 1226(c).[4]  However, courts have the authority to order those detained in violation of their due process rights released, notwithstanding § 1226(c).  *See Cabral v. Decker*, 331 F. Supp. 3d 255, 259 (S.D.N.Y. 2018) (collecting cases).  Thus, Respondents have failed to justify Petitioners' continued detention in unsafe conditions.

Finally, the public interest favors Petitioners' release.  Petitioners are confined for civil violations of the immigration laws.  In the highly unusual circumstances posed by the COVID-19 crisis, the continued detention of aging or ill civil detainees does not serve the public's interest.  *See* Declaration of Dr. Homer Venters ¶ 12, *Fraihat v. U.S. Imm. and Customs Enforcement*, 5:19 Civ. 1546, ECF No. 81-11 (C.D. Cal. Mar. 24, 2020) (opining that "the design and operation of detention settings promotes the spread of communicable diseases such as COVID-19"); Declaration of Dr. Carlos Franco-Paredes, *id.* at ECF No. 81-12 at 1 ("Immigration detention centers in the U.S. are tinderboxes for the transmission of highly transmissible infectious pathogens including the SARS-CoV-2, which causes COVID-19.  Given the large population density of immigration detention centers and the ease of transmission of this viral

---

[4]  As represented by Petitioners' counsel, Martinez's § 1226(c) detention was triggered by his conviction for controlled substances trafficking in 2014, an offense for which he served no term of imprisonment.  Pena's § 1226(c) detention was triggered by misdemeanor marijuana convictions from 2002.

pathogen, the attack rate inside these centers will take exponential proportions, consuming

significant medical and financial resources."); *Urgent action needed to prevent COVID-19*

*"rampaging through places of detention" – Bachelet*, UNHCR (Mar. 25, 2020),

https://www.ohchr.org/en/NewsEvents/Pages/ DisplayNews.aspx?NewsID=25745&LangID=e

(United Nations High Commissioners for Human Rights urging that detention of people in jails

"should be a measure of last resort, particularly during this crisis").  To the contrary, public

health and safety are served best by rapidly decreasing the number of individuals detained in

confined, unsafe conditions.  *See, e.g.*, *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425

F.3d 158, 169 (2d Cir. 2005) (referring to "public health" as a "significant public interest").

## CONCLUSION

For the reasons stated above, the TRO is GRANTED.  Respondents, and the Hudson,

Bergen, and Essex County Correctional Facilities are ORDERED to **<u>immediately</u>** release

Petitioners today on their own recognizance without fail.  Respondents are RESTRAINED from

arresting Petitioners for civil immigration detention purposes during the pendency of their

immigration proceedings.

The TRO will expire on **April 9, 2020**, at **6:30 p.m.**  No later than **April 2, 2020**, at

**12:00 p.m.**, Respondents must show cause why the TRO should not be converted to a

preliminary injunction.  Petitioners may file a response no later than **April 7, 2020**, at **12:00 p.m.**

SO ORDERED.

Dated:  March 26, 2020, at 6:30 p.m.
New York, New York

_____
ANALISA TORRES
United States District Judge