UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VASIF "VINCENT" BASANK; FREDDY
BARRERA CARRERRO; MANUEL BENITEZ
PINEDA; MIGUEL ANGEL HERNANDEZ
BALBUENA; LATOYA LEGALL; CARLOS
MARTINEZ; ESTANLIG MAZARIEGOS;
MANUEL MENENDEZ; ANTAR ANDRES
PENA; and ISIDRO PICAZO NICOLAS,

*Petitioner*,

-against-

THOMAS DECKER, in his official capacity as
Director of the New York Field Office of U.S.
Immigrations & Customs Enforcement; and
CHAD WOLF, in his official capacity as Acting
Secretary, U.S. Department of Homeland
Security,

*Respondents*.

+----------------------------------+
| USDC SDNY                        |
| DOCUMENT                         |
| ELECTRONICALLY FILED             |
| DOC #: _____           |
| DATE FILED:  __4/23/2020__       |
+----------------------------------+

20 Civ. 2518 (AT)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

Petitioners, Vasif "Vincent" Basank, Freddy Barrera Carrerro, Manuel Benitez Pineda,

Miguel Angel Hernandez Balbuena, Latoya Legall, Carlos Martinez, Estanlig Mazariegos,

Manuel Menendez, Antar Andres Pena, and Isidro Picazo Nicolas, were detained by Immigration

and Customs Enforcement ("ICE") in county jails where cases of COVID-19 have been

identified.  Petition ¶ 2, ECF No. 9.  Petitioners filed a petition for a writ of habeas corpus under

28 U.S.C. § 2241, requesting release from ICE custody because of the public health crisis posed

by COVID-19.  *See* Petition.  Petitioners also submitted an application for a temporary

restraining order ("TRO") and preliminary injunction pursuant to Rule 65 of the Federal Rules of

Civil Procedure, seeking an order (1) releasing them on their own recognizance, subject to

reasonable and appropriate conditions, and (2) restraining Respondents, Thomas Decker, in his

official capacity as Director of the New York Field Office of ICE, and Chad Wolf, in his official

capacity as Acting Secretary of the U.S. Department of Homeland Security, from arresting

Petitioners for civil immigration detention purposes during the pendency of their immigration

proceedings.  TRO Mem. at 1, ECF No. 6.

      The Court granted the TRO, and directed Respondents to show cause why it should not

be converted into a preliminary injunction.  TRO at 15, ECF No. 11.  For the reasons stated

below, Petitioners' request for a preliminary injunction is GRANTED as follows:  (1) Petitioners

shall remain released, subject to conditions to be set by the Court, and (2) Respondents are

RESTRAINED from arresting Petitioners for civil immigration detention purposes unless

Respondents first obtain the Court's permission.

## BACKGROUND

      Petitioners were detained by ICE in connection with removal proceedings pending at the

Varick Street Immigration Court.  Petition ¶¶ 5–14.  They were housed in New Jersey county

jails where either detainees or staff have tested positive for COVID-19.  TRO at 6.  Specifically,

Basank, Benitez Pineda, and Mazariegos were detained at the Hudson County Correctional

Facility ("Hudson County Jail").  *Id.* ¶¶ 5, 7, 11.  Barrera Carrerro, Hernandez Balbuena, Legall,

Martinez, and Menendez were detained at the Bergen County Correctional Facility ("Bergen

County Jail").  *Id.* ¶¶ 6, 8, 9, 10, 12.  Pena and Picazo Nicolas were detained at the Essex County

Correctional Facility ("Essex County Jail").  *Id.* ¶¶ 13–14.

      Each Petitioner suffers from chronic medical conditions, and faces an imminent risk of

serious illness or death if exposed to COVID-19.  Basank is 54 years old and has a lengthy

history of smoking.  *Id.* ¶ 5.  Barrera Carrerro, age 39, suffers from underlying health conditions,

including obesity, respiratory problems, a history of gastrointestinal problems, and colorectal

bleeding.  *Id.* ¶ 6.  Benitez Pineda is 44, with pulmonary issues and a history of hospitalization

2

for severe pneumonia.  *Id.* ¶ 7.  Hernandez Balbuena has diabetes and diabetes-related

complications.  *Id.* ¶ 8.  Legall, age 33, suffers from respiratory problems, including asthma.  *Id.*

¶ 9.  At 56, Martinez, has severe heart disease, including a history of hospitalization for

congestive heart failure, severe aortic valvular insufficiency, and acute systolic failure, requiring

immediate heart valve replacement surgery.  *Id.* ¶ 10.  Mazariegos is 44, and suffers from high

blood pressure and pre-diabetes.  *Id.* ¶ 11.  Menendez, age 31, suffers from chronic asthma.  *Id.*

¶ 12.  At 36, Pena is asthmatic and has chronic obstructive pulmonary disease ("COPD"), which

require inhalers and other medical treatment.  *Id.* ¶ 13.  Picazo Nicolas is 40 and suffers from

Type II diabetes and morbid obesity.  *Id.* ¶ 14.

Petitioners moved for a TRO on March 25, 2020.  ECF No. 6.  The Court held a

telephonic hearing on March 26, 2020, *see* ECF No. 7, and granted the motion that day, ECF No.

11.  The Court extended the TRO for good cause for an additional fourteen days in order to

consider the parties' submissions on the question of whether the TRO should be converted to a

preliminary injunction.  ECF No. 28.[1]  The Court now addresses, in turn, Respondents' argument

that the action should be severed into ten individual proceedings, the jurisdictional question of

mootness, and the merits of Petitioners' request for a preliminary injunction.

## DISCUSSION

I.    Severance

Respondents argue that the petition should be severed into separate habeas actions for

each Petitioner.  Resp. Opp. at 19–22, ECF No. 17.  The Court disagrees.

First, severance is inappropriate given the equities and the time the Court has already

---

[1] The Court concludes that the record is sufficient to resolve the matter without an evidentiary hearing.  *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("An evidentiary hearing is not required when the relevant facts either are not in dispute . . . or when the disputed facts are amenable to complete resolution on a paper record." (citations omitted)).

devoted to considering the parties' submissions.  *See Coronel v. Decker*, 20 Civ. 2472, 2020 WL 1487274, at *2 (S.D.N.Y. Mar. 27, 2020) ("Considerations of judicial economy—the [c]ourt has already read and digested the record and heard lengthy oral argument on this motion—and the urgent need to timely decide [p]etitioners' motion for a temporary restraining order in light of the immediate risk to the health of the [p]etitioners counsel against severance at this juncture."); *see also id.*, ECF No. 35 at 3 (S.D.N.Y. Apr. 1, 2020) (denying without prejudice the respondents' motion to sever the joint petition after receiving further briefing).

Second, a single habeas action is merited because this matter is "uncluttered by subsidiary issues." *United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125–26 (2d Cir. 1974). In *Sero*, the Second Circuit considered a proposed habeas corpus class action brought by young adult misdemeanants (ages 16 to 21), on behalf of themselves and all others similarly situated, who were serving a reformatory sentence in excess of the adult penalty for the same misdemeanor. *Id.* at 1119.  The court of appeals held that a "multi-party proceeding similar to the class action authorized by [Rule 23 of the Federal Rules] of Civil Procedure" was permissible, because the judiciary has the inherent authority under the All Writs Act, 28 U.S.C. § 1651, to fashion "expeditious methods of procedure in a specific case." *Id.* at 1125 (citing *Harris v. Nelson*, 394 U.S. 286, 294 (1969)); *see also Bertrand v. Sava*, 684 F.2d 204, 219 (2d Cir. 1982) (finding no error in the district court's decision to "certify a [habeas] class of 'all Haitian aliens transferred from [an Immigration and Naturalization Service facility] . . . , who have requested political asylum and parole, but have remained in respondent's custody'" (citation omitted)).

Here, the health risks posed by COVID-19 and the constitutional claims presented do not turn on facts unique to each Petitioner beyond their having preexisting conditions that make them

vulnerable to the virus.  *Cf. Bob v. Decker*, No. 19 Civ. 8226, ECF No. 4 at 3 (S.D.N.Y. Oct. 15, 2019) (requiring three *pro se* petitioners to proceed in three separate habeas actions, because the petitioners each alleged that they were denied a different type of medical care).  Rather, Petitioners raise almost identical questions of law and fact, including whether Respondents are adequately protecting Petitioners from contracting COVID-19, whether Respondents are deliberately indifferent to Petitioners' medical needs, and whether release from detention is justified under these circumstances.  *See* Petition.

Third, Petitioners allege shared harms, including the alleged systemic failure of Respondents to identify and protect individuals in immigration detention at the Hudson, Bergen, and Essex County Jails who are at high risk of complications from COVID-19.  The extraordinary circumstance of the COVID-19 crisis warrants a multi-party habeas petition permitting expeditious resolution of the claims before the Court.

The Court concludes, therefore, that considerations of "judicial economy and fairness argue persuasively for the construction of a procedure" such as this multi-party habeas action, where Petitioners "shar[e] certain complaints about the legality" of their confinement.  *Bertrand v. Sava*, 535 F. Supp. 1020, 1024 (S.D.N.Y. 1982) (citations omitted), *rev'd on other grounds*, 684 F.2d 204 (2d Cir. 1982); *see also id.* at 1024–25 ("Such initiative and flexibility are essential to modern use of the writ [of habeas corpus] in order to cut through barriers of form and insure that miscarriages of justice are corrected.").

Accordingly, Respondents' request to sever the action into ten individual habeas petitions is DENIED.

II.    <u>Mootness</u>

Prior to the Court's issuance of the TRO, Respondents had decided to voluntarily release

five of the original Petitioners:  Basank, Benitez Pineda, Hernandez Balbuena, Legall, and

Menendez.  Resp. Opp. at 18; *see also Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503,

at *1 n.1 (S.D.N.Y. Mar. 26, 2020) (noting that the Court had not yet been notified that those

Petitioners had in fact been released).  "Under Article III of the U.S. Constitution, when a case

becomes moot, the federal courts lack subject matter jurisdiction over the action." *Doyle v.*

*Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (internal quotation marks, citation,

and alterations omitted).  "Under 28 U.S.C. § 2241, the habeas statute under which petitioner[s]

challenged [their] detention, [courts] retain jurisdiction so long as the petitioner[s are] 'in

custody.'" *Pierrilus v. U.S. Immigration & Customs Enforcement*, 293 F. App'x 78, 79 (2d Cir.

2008).  But the Second Circuit has explained that "[f]ollowing his release from ICE custody, [a

petitioner] is no longer suffering an 'actual injury,'" and the case is moot, at least where the

petitioner "has not shown a 'reasonable expectation' that he will be subjected to the same action

again." *Leybinsky v. U.S. Immigration and Customs Enforcement*, 553 F. App'x 108, 109 (2d

Cir. 2014) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Lewis v. Cont'l Bank Corp.*, 494

U.S. 472, 481 (1990)); *see also Diop v. Sessions*, No. 18 Civ. 8245, 2019 WL 1894387, at *2

(S.D.N.Y. Mar. 20, 2019) ("[W]here a petitioner . . . is no longer in custody the petition no

longer presents a live controversy and is moot, warranting dismissal for lack of subject matter

jurisdiction." (internal quotation marks, citation, and alterations omitted)).

Though it is possible that Respondents might seek to rearrest the five Petitioners who

were voluntarily released, Petitioners have not demonstrated a "reasonable expectation" that they

would be subject to rearrest while the dangerous conditions in ICE detention facilities persist.

And if Respondents did seek to detain them before the threat of infection had passed, a renewed habeas petition would doubtless be successful.  Because those Petitioners were voluntarily released from "ICE custody, the[ir] petition[s] ha[ve] been rendered moot divesting the Court of subject matter jurisdiction." *Diop*, 2019 WL 1894387, at *2.

Accordingly, Petitioners' motion for a preliminary injunction is DENIED as moot as to Basank, Benitez Pineda, Hernandez Balbuena, Legall, and Menendez.

However, the Court does not conclude that the action is moot as to the remaining five Petitioners:  Barrera Carrero, Martinez, Mazariegos, Pena, and Picazo Nicolas.  Given Respondents' repeated emphasis on the statutory and regulatory regime that, in its regular course, would allow Petitioners to be "at any time . . . arrested and taken into custody," it is clear that a live case or controversy exists as to the remaining Petitioners.  Resp. Opp. at 23–24. Unlike in *Leybinsky*, where redetention was only possible if the former ICE detainee violated the conditions of his release, 533 F. App'x at 109–10, here, Respondents assert both a broad power and the specific intention to take into custody the five Petitioners whom ICE did not voluntarily release.  *See* Resp. Opp. at 24 (opposing a preliminary injunction that would continue to "enjoin the government not only from [the] detention, but [the] reapprehension" of Petitioners, and relying on statutes and regulations that Respondents assert permit the rearrest of Petitioners "at any time").  But for the Court's order restraining Respondents from rearresting Petitioners, Respondents would presumably seek to detain Petitioners anew.  Therefore, a live case or controversy continues to exist as the Court considers whether to convert its TRO into a preliminary injunction—a step Respondents vigorously oppose.  *See generally* Resp. Opp.

Accordingly, the Court turns to the claims of the remaining Petitioners.[2]

---

[2] For the remainder of this opinion, the term "Petitioners" encompasses only Barrera Carrero, Martinez, Mazariegos, Pena, and Picazo Nicolas.

III.   Preliminary Injunction

    A.  Legal Standard

A preliminary injunction sought against government action taken pursuant to a statute or regulatory scheme requires that "the moving party . . . demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).  "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted).

    B.  Analysis

        1.  Irreparable Harm

To establish irreparable harm, Petitioners "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id*. (internal quotation marks and citation omitted).  Petitioners have shown irreparable injury by establishing the risk of harm to their health and constitutional rights.  *See Barbecho v. Decker*, No. 20 Civ. 2821, 2020 WL 1876328, at *6 (S.D.N.Y. Apr. 15, 2020) ("[I]rreparable harm exists where, as here, petitioners face imminent risk to their health, safety, and lives." (internal quotation marks and citation omitted)).  The Court addresses each harm in turn.

           a.  Risk of Serious Illness or Death

Based on the record before it, the Court concludes that Petitioners would face a risk of serious illness or death if returned to civil immigration detention at the Hudson, Bergen, and

Essex County Jails.

i.    Hudson, Bergen, and Essex County Jails

As of the date of this opinion, there are more than 2.6 million confirmed cases of
COVID-19 worldwide and over 854,000 cases in the United States.  Center for Systems Science
and Engineering at Johns Hopkins University, *Coronavirus COVID-19 Global Cases*,
Coronavirus Resource Center (Apr. 23, 2020), https://coronavirus.jhu.edu/map.html.  Some
186,640 people have died from the disease worldwide; at least 15,074 have died in New York
City, all in the course of a few weeks.  *Id.*  New Jersey also has a significant outbreak of the
virus, with 606 deaths in Hudson County, 907 deaths in Bergen County, and 932 deaths in Essex
County.  New Jersey Dep't of Health, *New Jersey COVID-19 Dashboard*, Official Site of the
State of New Jersey (Apr. 23, 2020), https://www.nj.gov/health/cd/topics/covid2019_dashboard.
shtml (noting 99,989 confirmed cases and 5,368 deaths statewide).

The nature of detention facilities makes exposure and spread of the virus particularly
harmful.  Numerous courts have recognized that "individuals in carceral settings are at a
significantly higher risk of spreading infectious diseases." *United States v. Gross*, No. 15 Cr.
769, 2020 WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020) (internal quotation marks and alterations
omitted) (collecting cases).  Jaimie Meyer, M.D., M.S., who has worked extensively on
infectious disease treatment and prevention in the context of jails and prisons, submitted a
declaration in this district noting that the risk of COVID-19 to people held in New York-area
detention centers, including the Hudson, Bergen, and Essex County Jails, "is significantly higher
than in the community, both in terms of risk of transmission, exposure, and harm to individuals
who become infected."  Meyer Decl. ¶ 7, *Velesaca v. Wolf*, 20 Civ. 1803 (S.D.N.Y. Feb. 28,
2020), ECF No. 42; *see also Cases Surge in an Ohio Prison*, The New York Times (Apr. 20,

9

2020), https://www.nytimes.com/2020/04/20/us/coronavirus-live-news.html ("Despite warnings

from health officials and attempts to release some inmates to avoid outbreaks, jails, prisons and

detention centers have emerged as major coronavirus spreaders.  As of [April 20, 2020], four of

the 10 largest-known sources of infection in the United States were correctional facilities . . . .").

The three counties where the jails are located—Hudson, Bergen, and Essex Counties—

contain over one-third of the COVID-19 cases in New Jersey.  Petition ¶ 36; New Jersey Dep't

of Health, *New Jersey COVID-19 Dashboard*, Official Site of the State of New Jersey (Apr. 23,

2020), https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml.  The jails are no

exceptions.  Each of the jails where a Petitioner was housed has reported confirmed cases of

COVID-19.  Petition ¶ 41.  This includes, at the time of the Petition's filing, two inmates in the

Hudson County Jail; one detainee and a correctional officer at the Bergen County Jail; and a

"superior officer" at the Essex County Jail.  *Id.*  Since then, the numbers of positive cases have

only increased.  *See* Pet. Reply at 5 n.19, ECF No. 26 (citing newspaper reporting as of April 6,

2020 at 7:00 p.m. of "two ICE detainees, one pretrial detainee, and 16 staff infected at the

Bergen County Jail; two ICE detainees, 20 pretrial detainees, and 41 staff infected at the Hudson

County Jail; and two ICE detainees and 16 staff infected at the Essex County Jail").

Indeed, the Hudson County Jail faces rising numbers of COVID-19 cases.  *See* John

Heinis, *County Jail COVID-19 Update: 4th Worker Dies, 26 in Custody Tested Positive, 87 COs

Self-Isolating*, Hudson County View (Apr. 7, 2020), https://hudsoncountyview.com/county-jail-

covid-19-update-4th-worker-dies-26-in-custody-tested-positive-87-cos-self-isolating (reporting

that "[t]he Hudson County Jail has infection rates at nearly ten times that of the state as a whole";

that seven out of a total ten ICE detainees tested at the Hudson County Jail were confirmed

positive for COVID-19, and that a fourth worker at the facility died on April 6, 2020 from the

virus, making him "the third civilian employee of the jail to pass in a span of about 48 hours").

With regard to the Bergen County Jail, another court in this district observed that the "imminence" of the risk to detainees' health "is underscored by the fact that since March 24, 2020"—and as of April 14, 2020—"the number of confirmed cases of COVID-19 among detainees, inmates, and staff at the Bergen County Jail has increased from only one to nearly 20, including 16 Bergen County Corrections Police Officers who work at the [j]ail." *Barbecho*, 2020 WL 1876328, at *6 (citations omitted).

This Court also recently concluded that vulnerable detainees at the Essex County Jail are at risk of serious illness or death, notwithstanding the additional measures taken at the facility. *Valenzuela Arias v. Decker*, No. 20 Civ. 2802, 2020 WL 1847986, at *4 (S.D.N.Y. Apr. 10, 2020)  ("Though ICE and the Essex County Jail have taken some steps to mitigate the spread of COVID-19, the risk of Petitioners' infection is still very real.").  As of April 3, 2020, 78 detainees and inmates were in quarantine at the Essex County Jail.  Pet. Reply at 6 (citation omitted).

A number of courts in this district and elsewhere have recognized the threat that COVID-19 poses to individuals held in jails and detention facilities, and the Hudson, Bergen, and Essex County Jails are, unfortunately, no exception.  *See, e.g.*, *Coronel*, 2020 WL 1487274, at *3 ("[B]eing in immigration detention places [p]etitioners at significantly higher risk of contracting COVID-19.  Individuals in carceral settings are at a 'significantly higher' risk of spreading infectious diseases." (citation omitted)); *United States v. Stephens*, No. 15 Cr. 95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("[I]nmates may be at a heightened risk of contracting COVID-19 should an outbreak develop.") (collecting authorities); *In the Matter of the Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N.J. Mar. 22, 2020) (holding that

"reduction of county jail populations, under appropriate conditions, is in the public interest to mitigate risks imposed by COVID-19" in light of "the profound risk posed to people in correctional facilities arising from the spread of COVID-19").

ii.    Petitioners' Medical Conditions

Courts have recognized the health risk posed by COVID-19 to be particularly acute for detainees who have underlying illnesses. *See Jones v. Wolf*, No. 20 Civ. 361, 2020 WL 1643857, at *13 (W.D.N.Y. Apr. 2, 2020) ("[P]etitioners with the CDC-identified vulnerabilities face a grave, irreparable risk to their health and safety if they remain confined under current conditions" in a facility where COVID-19 is spreading); *United States v. Martin*, No. 19 Cr. 140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) ("[T]he Due Process Clauses of the Fifth or Fourteenth Amendments, for federal and state pretrial detainees, respectively, may well be implicated if defendants awaiting trial can demonstrate that they are being subjected to conditions of confinement that would subject them to exposure to serious (potentially fatal, if the detainee is elderly and with underlying medical complications) illness.").

The Court takes judicial notice that COVID-19 causes severe medical complications and has increased lethality amongst people of advanced age, and those with underlying health problems, or both. *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html ("[O]lder adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19."); *Information for Healthcare Professionals: COVID-19 and Underlying Conditions*, Centers for Disease Control and Prevention (Apr. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html (listing, among other medical diagnoses, "moderate to

severe asthma," "people who have serious heart conditions," "severe obesity," and "diabetes" as conditions that trigger higher risk of severe illness from COVID-19); *see* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."); *Brickey v. Superintendent, Franklin Corr. Facility*, No. 10 Civ. 085, 2011 WL 868148, at *2 n.3 (N.D.N.Y. Feb. 17, 2011) (taking judicial notice of the meaning and symptoms of sciatica), *report and recommendation adopted*, 2011 WL 868087 (N.D.N.Y. Mar. 10, 2011); *Lin v. Metro. Life Ins. Co.*, No. 07 Civ. 03218, 2010 WL 668817, at *1 (S.D.N.Y. Feb. 25, 2010) ("In its decision, the Court took judicial notice of certain medical background information about Hepatitis B.").

Petitioners are at particular risk for serious illness or death, because their preexisting medical conditions either make them more vulnerable to contracting COVID-19, or more likely to develop serious complications due to COVID-19, or both.  Each Petitioner has underlying illnesses, including asthma, diabetes, heart disease, hypertension, obesity, and respiratory problems such as COPD.  Petition ¶¶ 5–14.[3]

The risk that Petitioners will face a severe, and quite possibly fatal, infection if they are returned to immigration detention constitutes irreparable harm warranting a preliminary

---

[3] Respondents do not dispute that Barrera Carrerro, Martinez, Pena, and Picazo Nicolas have underlying illnesses qualifying them as high-risk based on CDC guidelines.  *See generally* Resp. Opp.  Respondents, however, "note that Petitioner Mazariegos's alleged medical conditions, high blood pressure and pre-diabetes, do not appear to qualify him as high risk."  Resp. Opp. at 21 n.6.  The Court disagrees.  The CDC has recognized that hypertension—*i.e.*, high blood pressure—is a condition that puts an individual at "higher risk for severe disease or death from COVID-19."  *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020*, Centers for Disease Control and Prevention (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2 htm.  Accordingly, though Respondents make this passing observation in a footnote, and have not argued outright that Mazariegos's high blood pressure is insufficient to warrant relief, the Court rejects any implication of the kind.  The CDC has cautioned that "the potentially higher risk for more severe disease from COVID-19 associated with the presence of underlying conditions"—including hypertension— "highlight the importance of COVID-19 prevention in persons with underlying conditions."  *Id.*; *see also In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 8, 2007) ("Arguments which appear in footnotes are generally deemed to have been waived.").

injunction. *See Barbecho*, 2020 WL 1876328, at *6 (concluding that petitioners "face a risk of severe, irreparable harm—including death—if they contract COVID-19" and met burden of showing irreparable harm); *Valenzuela Arias*, 2020 WL 1847986, at *5 (holding that immigration detainees at the Essex County Jail faced irreparable harm because of the threat of COVID-19); *Coronel*, 2020 WL 1487274, at *3 ("Due to their serious underlying medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19."); *see also Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (upholding finding of irreparable injury "premised . . . upon [the district court's] finding that [plaintiff] was subject to risk of injury, infection, and humiliation"); *Mayer v. Wing*, 922 F. Supp. 902, 909 (S.D.N.Y. 1996) ("[T]he deprivation of life-sustaining medical services . . . certainly constitutes irreparable harm.").

b.   Constitutional Violations

Second, Petitioners have also shown irreparable injury because they allege a violation of their constitutional rights.  In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm.  *See, e.g.*, *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks and citation omitted)); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary); *Sajous v. Decker*, No. 18 Civ. 2447, 2018 WL 2357266, at *12 (S.D.N.Y. May 23,

2018) (finding that immigration detainee established irreparable injury by alleging that prolonged immigration detention violated his constitutional due process rights).

The Court finds, therefore, that Petitioners have established the threat of irreparable harm absent the preliminary injunction.

### 2.   Likelihood of Success on the Merits

Petitioners argue that a return to confinement in the Hudson, Bergen, or Essex County Jails would violate their due process rights.  Pet. Reply at 11.  The Court agrees. Notwithstanding the steps that have been taken by those facilities since the Court issued its TRO, Petitioners have met their burden of showing a likelihood of success on the merits.

### a.   Legal Standard

The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law.  The protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  An application for habeas corpus under 28 U.S.C. § 2241 is the appropriate vehicle for an inmate in federal custody to challenge conditions or actions that pose a threat to his medical wellbeing.  *See Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979) (allowing a § 2241 application to challenge an inmate's "transfer while seriously ill" where that transfer posed a risk of fatal heart failure).

Immigration detainees can establish a substantive due process violation for unmet medical needs by showing that a government official "knew, or should have known" of a condition that "posed an excessive risk to health," and failed to take appropriate action. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).  "Deliberate indifference" to serious medical needs

"can be established by either a subjective or objective standard:  A plaintiff can prove deliberate indifference by showing that the defendant official recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to the plaintiff's health or safety."  *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) (internal quotation marks, citation, and alterations omitted).

Additionally, the Supreme Court has recognized that government authorities may be deemed "deliberately indifferent to an inmate's current health problems" where they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," including "exposure of inmates to a serious, communicable disease," even when "the complaining inmate shows no serious current symptoms."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Petitioners need not demonstrate that "they actually suffered from serious injuries" to show a due process violation.  *Darnell*, 849 F.3d at 31; *see Helling*, 509 U.S. at 33.  Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to their future health" is sufficient.  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35 (alteration omitted)).

b.  Analysis

Respondents argue that ICE has set in motion various steps to improve health and sanitation at the Hudson, Bergen, and Essex County Jails, and Respondents have submitted declarations of the facilities' wardens attesting to the actions taken.  *See* ECF Nos. 17, 19, 21, 23, 24, 29.  Respondents contend that these measures dispel any notion of indifference, much less deliberate indifference.  Resp. Opp. at 15–18.  The standard for deliberate indifference, however, is not one of malice.  Rather, Petitioners may establish deliberate indifference through intentional

denial of care (the subjective standard), *or* by showing that Respondents "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [Respondents] knew, or should have known, that the condition posed an excessive risk to [the Petitioners'] health or safety" (the objective standard). *Charles*, 925 F.3d at 87.[4] Based on the record before it, the Court concludes that the objective standard for deliberate indifference has been met.[5]

First, the Court finds that Respondents have not implemented specific measures to identify, protect, and treat inmates who are at a heightened risk of contracting or suffering grave complications from COVID-19. For example, Respondents do not mention processes for screening, shielding from infection, or considering for release high-risk individuals. *See generally* ECF Nos. 17, 18, 19, 23, 24, 29. Protection of detainees with underlying health conditions appears to be limited to "daily monitoring," with a "plan to remove the inmates from the rest of the population should the need arise." Edwards Decl. ¶ 12(g)(4), ECF No. 29-1; Ortiz Decl. ¶ 15(f), ECF No. 29-2. It is not clear, however, what "daily monitoring" entails. For

---

[4] Respondents repeatedly mischaracterize *Charles* to imply that the Court may find deliberate indifference only if, in addition to finding that Respondents have objectively failed to act with reasonable care, the Court separately finds that their actions "shock[] the contemporary conscience." Resp. Opp. at 1, 16. That is not the law. Instead, the Second Circuit has explicitly stated that, with respect to a claim of unmet medical needs by detainees, once deliberate indifference is shown, a "court need not . . . conduct a separate analysis, over and above the deliberate indifference analysis, of whether the state's conduct 'shocks the conscience.'" *Charles*, 925 F.3d at 86; *see id.* n.11 (clarifying that the court of appeals has applied "separate 'shocks the conscience' analysis in cases that do not involve the medical needs of those the state has taken into custody"). In other words, the failure to take objectively necessary measures to protect vulnerable inmates from a deadly pandemic is *per se* conscience-shocking. *See id.* at 86 ("The Supreme Court has held that the point of conscience shocking is reached when government actors are deliberately indifferent to the medical needs of pretrial detainees.").

[5] The Court concludes that Petitioners have established a likelihood of success on the merits on their substantive due process claim, both articulated as a conditions of confinement claim, *see Helling*, 509 U.S. at 33 (discussing a conditions of confinement claim and raising "exposure of inmates to a serious, communicable disease" as an example), as well as an unmet medical needs claim, *see Charles*, 925 F.3d at 87 (discussing deliberate indifference to medical needs). Indeed, where, as here, a communicable disease renders the general conditions of confinement dangerous to Petitioners' health, and meeting Petitioners' medical needs requires that Respondents take specific measures to prevent their infection, the conditions of confinement and unmet medical needs claims essentially merge.

vulnerable detainees like Petitioners, monitoring them for signs of infection is too little, too late. The best, and perhaps only, way to protect them is to prevent infection in the first place. Respondents have not taken meaningful steps to do so.

Second, with respect to general conditions of confinement, the evidence submitted by Respondents does not indicate that social distancing is being practiced in various daily situations inside the Hudson, Bergen, and Essex County Jails. *See How to Protect Yourself & Others*, Centers for Disease Control and Prevention (Apr. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (recommending maintaining at least six feet of distance from other persons at all times and noting that "keeping distance from others is especially important for people who are at higher risk of getting very sick"). Even crediting the declarations of the facilities' wardens, who claim that social distancing is possible within the confines of a jail cell, Respondents cannot be heard to say that while asleep in bunk beds, inmates are positioned six feet apart from one another. *Compare* Ahrendt Decl. ¶ 6, ECF No. 29-3 (claiming that social distancing is possible in Bergen County Jail cells that measure 10 feet by 7 feet and have bunk beds, but failing to explain how cellmates can maintain a six-foot distance while asleep or when moving about the cell in order to use the toilet or stretch their legs); Ortiz Decl. ¶ 6 (claiming that "spacing in the buildings [in Essex County Jail] allow" for social distancing, but failing to address whether bunk beds in dorms permit social distancing); Edwards Decl. ¶ 11 (claiming that Hudson County Jail permits detainees to practice social distancing "outside of their cell," but failing to address whether detainees can maintain social distancing within cells), *with* Picasso Decl. ¶ 6, ECF No. 26-3 (noting that detainees in Essex County Jail sleep "very close together—two people in a small room with bunk beds"); Lituma Marca Decl. ¶ 6, ECF No. 26-4 (describing close proximity of

detainees within a cell in Hudson County Jail); Legall Decl. ¶ 6, ECF No. 26-1 (describing close proximity of detainees within a cell in Bergen County Jail).

Moreover, even in the common areas, it does not appear that detainees are being required to practice social distancing, including when using the telephones. *See* Sanchez Decl. ¶ 14, ECF No. 26-5 (noting that he tried to stay away from other detainees but "had to use the same phone that everyone else used"); Picasso Decl. ¶¶ 4–5 (attesting that it was impossible to maintain six feet of distance in the common space); Basank Decl. ¶¶ 4, 8, ECF No. 26-6 (same); Lituma Marca Decl. ¶¶ 5, 7, 16 (stating that social distancing was not enforced); Legall ¶ 14 (describing being stressed because of her asthma and knowing she was at risk, and she "tried [her] best to stay away from others but that was not always possible" in the dorm); Alvarez Santana Decl. ¶ 4, ECF No. 26-2 (noting that detainees were not asked to, nor could they, comply with social distancing rules, such as when making phone calls).

Additionally, in these facilities, individuals exhibiting symptoms of COVID-19 often wait to receive medical attention, are not separated from cellmates, and may be returned to the general population. *See* Sanchez Decl. ¶¶ 7, 9; Lituma Marca Decl. ¶¶ 7–8 (describing a man in the unit who had diabetes: "He was taken to the hospital, but they brought him back the same day in the afternoon. We asked him if he had contracted the virus and he told us that a doctor had told him that he probably contracted the virus. The prison administration returned him to his cell with his cellmate . . . he looked sick. His face was pale, he looked weak, and I heard him coughing."). Each facility also uses "cohorting" to separate possibly infected detainees, but instead of isolating each individual, they are grouped together, *see* Ahrendt Decl. ¶ 9(i); Edwards Decl. ¶ 17; Ortiz Decl. ¶ 20; Moon Decl. ¶ 10, a practice which risks spreading the virus to otherwise healthy inmates, and which the Centers for Disease Control and Prevention ("CDC")

advises should be utilized only as a last resort.  *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (indicating that individuals should be cohorted together only if facilities are unable to accommodate individual isolation).  Respondents do not claim, however, that they cohort detainees because isolation of individual inmates is not possible at the Hudson, Bergen, and Essex County Jails.

Finally, Respondents have offered no evidence indicating that testing is widely offered or used to ascertain the scope of the outbreak, in order to better contain and treat the outbreak within the facilities.  *See* Ahrendt Decl. ¶ 15 (failing to address whether symptomatic or high-risk individuals are tested and under what circumstances, or explain whether other individuals will be tested); Edwards Decl. ¶ 15 (stating that the Hudson County Jail "uses UTM-RT to test any detainees or inmates who require testing for COVID-19," but failing to describe the criteria for testing or the rate at which tests are performed on inmates who "require" them); Ortiz Decl. ¶¶ 4, 16(a), 17–18 (indicating that the Essex County Jail acquired 50 testing kits, but failing to explain how those kits can be used effectively to protect a jail population of close to 2,000, and conceding that "mildly symptomatic detainees" are not tested).

A number of courts in this district and beyond have held that habeas petitioners have demonstrated a likelihood of success under similar conditions.  In *Valenzuela Arias*, this Court ordered immediate release of two individuals detained in ICE custody at the Essex County Jail.  2020 WL 1847986, at *9.  In *Coronel*, another court in this district released seven ICE detainees at the Bergen and Essex County Jails, due to their underlying medical conditions, which include obesity, hypertension, and gastrointestinal problems.  2020 WL 1487274, at *1, *6, *10.  As in

*Coronel*, "ICE has not taken any action to address the particular risks COVID-19 poses to high-risk individuals like the Petitioners here." *Id.* at *4.  Likewise, in *Avendaño Hernandez v. Decker*, a court in this district held that an immigration detainee had established a "substantial claim for deliberate indifference" where ICE and the county jail in which he was held had "not taken any action to address the particular risks that COVID-19 poses to high-risk individuals," but rather had carried out "only generalized proactive measures to prevent detainees within [their] care from contracting and spreading the virus."  No. 20 Civ. 1589, 2020 WL 1547459, at *2–3 (S.D.N.Y. Mar. 31, 2020) (internal quotation marks and citation omitted).[6]

To be clear, the Court does not hold that the CDC's guidelines amount to strict rules of constitutional law that Respondents must follow in every circumstance.  The Court does, however, take the numerous ways in which Respondents' facilities' failure to implement basic elements of social distancing, isolation, and protective measures for high-risk individuals to be an overwhelming indication that the conditions of confinement are dangerous to detainees like Petitioners, and that their specific medical needs as vulnerable individuals would go unmet in the

---

[6] Courts in other districts have also found that ICE detainees have shown a likelihood of success on their claims that continued confinement, without adequate protection for their health, violates their due process rights.  In *Hope v. Doll*, a court granted the immediate release of 22 immigration detainees held at facilities with reported COVID-19 cases, finding that "the protective measures in place . . . are not working."  No. 20 Civ. 562, ECF. No. 11 at 13–14 (M.D. Pa. Apr. 7, 2020).  As the court explained, "[i]t now seems that our worst fears have been realized—COVID-19 is spreading, and not nearly enough is being done to combat it.  We cannot allow the [p]etitioners before us, all at heightened risk for severe complications from COVID-19, to bear the consequences of ICE's inaction."  *Id.* at 9.  A court in that same district released 13 individuals from ICE detention, who suffered from medical conditions such as high blood pressure, diabetes, asthma, and trouble breathing.  *Thakker v. Doll*, No. 20 Civ. 480, 2020 WL 1671563, at *1, *10 (M.D. Pa. Mar. 31, 2020).  In finding that the petitioners had shown a likelihood of success on the merits, the court noted that the petitioners had demonstrated that, "despite their best efforts, they cannot practice these effective preventative measures in [detention] [f]acilities."  *Id.* at *8.  "Considering . . . the grave consequences that will result from an outbreak of COVID-19, particularly to the high-risk [p]etitioners in this case," the court determined that it "[could not] countenance physical detention in such tightly-confined, unhygienic spaces."  *Id.*  In *Malam v. Adducci*, the court released an ICE detainee, notwithstanding the precautionary measures taken by the facility, because the petitioner was "not ensured anything close to reasonable safety."  No. 20 Civ. 10829, 2020 WL 1672662, at *12 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) (internal quotation marks and citation omitted).  The court found that "the only reasonable response by [r]espondents is the release of [p]etitioner; any other response demonstrates a disregard of the specific, severe, and life-threatening risk to [p]etitioner from COVID-19."  *Id.*

Hudson, Bergen, and Essex County Jails.  As another court in this district recently concluded, "policies that are 'generally justifiable' may still 'amount[ ] to deliberate indifference to' the specific and unique medical needs of particular individuals."  *Barbecho*, 2020 WL 1876328, at *5 (quoting *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005)); *see id.* (concluding that, "even the increased precautions generally taken . . . do nothing to alleviate the *specific*, *serious*, and *unmet* medical needs of the high-risk detainees, who require greater precautions in light of their correspondingly greater risk of *severe* illness if they contract COVID-19"); *see also Coronel*, 2020 WL 1487274, at *5 (also noting the "specific, serious, and unmet medical needs" of inmates with underlying illnesses were sufficient to establish deliberate indifference).  Thus, as the Court previously concluded, "[c]onfining vulnerable individuals . . . without enforcement of requisite social distancing and without specific measures to protect their delicate health poses an unreasonable risk of serious damage to their future health, and demonstrates deliberate indifference."  *Basank*, 2020 WL 1481503, at *5 (internal quotation marks, citation, and alteration omitted).

The Court holds, therefore, that Petitioners are likely to succeed on the merits of their due process claim that Respondents knew or should have known that Petitioners' conditions of confinement pose excessive risks to their health and that their specific medical needs were unmet.[7]

### 3.   Balance of Equities and Public Interest

The equities and public interest weigh heavily in Petitioners' favor.  Petitioners face irreparable injury—to their constitutional rights and to their health.

The potential harm to Respondents is limited.  Respondents still have not identified any

---

[7] The Court does not reach Petitioners' additional argument that they are likely to succeed on the merits of the claim that their due process rights were violated because the facilities' conditions are punitive.  TRO Mem. at 8–9.

specific danger to the public or risk of flight that would justify returning Petitioners to confinement in an ICE detention facility, *see generally* Resp. Opp.  In any event, in converting the TRO to a preliminary injunction, the Court shall impose conditions of release that will address any such concerns.[8]  Respondents note that Martinez and Pena were mandatorily detained pursuant to 18 U.S.C. § 1226(c).  Resp. Opp. at 14.[9]  However, courts have the authority to order those detained in violation of their due process rights released, notwithstanding § 1226(c).  *See Cabral v. Decker*, 331 F. Supp. 3d 255, 259 (S.D.N.Y. 2018) (collecting cases). As such, Respondents have failed to justify Petitioners' detention in unsafe conditions.

Finally, the public interest favors Petitioners' release.  Petitioners are confined for civil violations of the immigration laws.  In the highly unusual circumstances posed by the COVID-19 crisis, the continued detention of aging or ill civil detainees does not serve the public's interest. To the contrary, public health and safety are served best by rapidly decreasing the number of individuals held in confined, unsafe conditions.  *See, e.g.*, *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (referring to "public health" as a "significant public interest").  As another court in this district has observed, "[d]ecreasing the [ICE detention]

---

[8] In actions brought by ICE detainees seeking habeas relief amid the COVID-19 epidemic, courts in this district, including this one, have considered the individual circumstances of the Petitioners and crafted conditions of release for those individuals.  *See, e.g.*, *Valenzuela Arias*, No. 20 Civ. 2802, ECF Nos. 20 and 21 (S.D.N.Y. Apr. 11, 2020) (imposing conditions, *inter alia*, home incarceration—the most restrictive condition of release—with telephonic and electronic monitoring, including placement of a beacon device in petitioner's residence); *see also Barbecho v. Decker*, No. 20 Civ. 2821, ECF No. 26 (S.D.N.Y. Apr. 16, 2020) (prohibiting petitioner from operating a motor vehicle and imposing other conditions such as telephonic and electronic monitoring); *Avendaño Hernandez v. Decker*, No. 20 Civ. 1589, ECF No. 20 (S.D.N.Y. Apr. 20, 2020) (requiring ankle monitoring and weekly call-ins to ICE); *Coronel v. Decker*, 20 Civ. 2472, ECF No. 28 (S.D.N.Y. Mar. 27, 2020) (releasing petitioners on their own recognizance and requiring enrollment in the Intensive Supervision Appearance Program in addition to electronic monitoring).

[9] As represented by Petitioners' counsel at oral argument on Petitioners' request for a TRO, Martinez's § 1226(c) detention was triggered by his conviction for controlled substances trafficking in 2014, an offense for which he served no term of imprisonment.  TRO Hr'g Tr. at 23:11–16, ECF No. 30; *see also* Resp. Opp. at 6 (noting Martinez's 2014 narcotics offense).  Likewise, Petitioners' counsel represented that Pena's § 1226(c) detention was triggered by misdemeanor marijuana convictions.  TRO Hr'g Tr. at 23:5–7; *see also* Resp. Opp. at 7–8 (noting that Pena pleaded guilty to criminal sale of marijuana in the fourth degree, a misdemeanor, in 2003).

population will . . . 'mitigate the damage' to both the [j]ail and the surrounding community and thereby 'reduce the death toll.'" *Barbecho*, 2020 WL 1876328, at *7 (discussing the Bergen County Jail) (quoting *United States v. Nkanga Nkanga*, No. 18 Cr. 713, 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020)). "Indeed, reducing the size of the population in jails and prisons reduces the level of risk both for those within those facilities and for the community at large." *Id.* (internal quotation marks, citation, and alterations omitted).

Accordingly, the Court holds that Petitioners have established their entitlement to a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.[10]

IV.     *Mapp v. Reno*

Even if Petitioners had not met the requirements for a preliminary injunction, the Court would release them on bail pending final resolution of their habeas claims under the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). In *Mapp*, the Second Circuit held "that the federal courts have inherent authority to admit to bail individuals properly within their jurisdiction" including immigration detainees petitioning for habeas relief. *Id.* A habeas petitioner's "fitness for bail" depends on "whether the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Id.* at 230 (internal quotation marks, citation and alteration omitted).

---

[10] Respondents argue that the preliminary injunction should terminate upon the entry of a final order of removal, and not extend to the pendency of any petition for review, because "the issuance of such final orders changes the legal basis of immigration detainees' detention, and presents different public interests in facilitating lawfully ordered removals." Resp. Opp. at 25. It is true that a different statutory provision authorizes detention of noncitizens against whom a final order of removal has been entered, *see* 8 U.S.C. § 1231(a)(2), but that change in statutory authority does not alter the unconstitutionality of holding detainees in conditions where they face an unreasonable risk of being infected with a deadly virus, the irreparable harm it causes, or the rank inequity and harm to the public that would result. Perhaps, if a final order of removal were entered against a Petitioner and not stayed by a court of appeals, and Respondents sought to execute that order without subjecting the Petitioner to unconstitutional conditions along the way, a modification of the preliminary injunction would be warranted, but the Court declines to pass on a hypothetical situation.

For the reasons already stated, Petitioners' habeas claims are plainly substantial.  Indeed, as the Court has already held, they are likely to succeed on the merits.  And releasing Petitioners from confinement pending final adjudication of their petition is necessary to "make the habeas remedy effective."  *Id.*  "Severe health issues have been the prototypical but rare case of extraordinary circumstances that justify release pending adjudication of habeas."  *Coronel*, 2020 WL 1487274, at *9 (collecting cases); *see, e.g.*, *Barbecho*, 2020 WL 1876328, at *8 ("If these Petitioners—whose medical conditions place them at a higher risk of severe illness, or death, from COVID-19—were to remain detained, they would face a significant risk that they would contract COVID-19—the very outcome they seek to avoid. Release is therefore necessary to make the habeas remedy effective." (internal quotation marks and citation omitted)); *United States v. Nkanga*, No. 18 Cr. 713, 2020 WL 1695417, at *3 (S.D.N.Y. Apr. 7, 2020) (granting bail pending resolution of a habeas claim under 28 U.S.C. § 2255 given "the defendant's age; his multiple health issues; the nature of the defendant's offense; [and] the precise timing of the sentencing proceeding (which occurred on March 12, 2020) in relation to the emerging COVID-19 pandemic" (internal quotation marks and citation omitted)); *Avendaño Hernandez*, 2020 WL 1547459, at *3 ("Petitioner argues that he is being subject to unconstitutional conditions of confinement—specifically, continued risk of exposure to COVID-19—and he seeks release so that he can avoid infection.  If Petitioner were to remain detained, he would face a significant risk that he would contract COVID-19—the very outcome he seeks to avoid." (internal quotation marks, citation and alterations omitted)).  Detention of Petitioners pending final adjudication of this action could cause severe illness or death—precisely the harm their petition seeks to avert. The effectiveness of the habeas remedy can only be preserved, therefore, by Petitioners' remaining released for the duration of this matter.

Accordingly, the Court holds, in the alternative to granting Petitioners' motion for a preliminary injunction, that bail shall be imposed pending final resolution of their petition for habeas corpus.  Their bail conditions shall be the same as those to be set under the preliminary injunction, as indicated below.

## CONCLUSION

For the reasons stated in this opinion, it is hereby ORDERED that Petitioners' request for a preliminary injunction is GRANTED as follows:  (1) Petitioners shall remain released, subject to conditions to be set by the Court, and (2) Respondents are RESTRAINED from arresting Petitioners for civil immigration detention purposes unless Respondents first obtain the Court's permission.

It is further ORDERED that the parties shall meet and confer, and propose reasonable conditions of release for each Petitioner by **April 24, 2020**.

The preliminary injunction shall remain in effect until further order of the Court.

SO ORDERED.

Dated: April 23, 2020
New York, New York

_____
ANALISA TORRES
United States District Judge